**FILED**

James J. Vilt Jr,
Clerk

3/16/2023

U.S. District Court
Western District of Kentucky

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

*ELECTRONICALLY FILED*

TIMOTHY J MCILWAIN

    Plaintiff

    v.

BROOKE BERRY, an individual, and
JOHN DOE 1-5, individually, inclusive

    Defendants

CASE NO.    3:23-cv-130-CHB

**COMPLAINT**

---

## COMPLAINT

Comes the Plaintiff, Timothy McIlwain, pro se and under oath, and for his Complaint against the Defendant Brooke Leah Berry, and asserts as follows:

### I.    INTRODUCTION

This is an action for compensatory and punitive damages arising from the Defendant's intentional infliction of emotional distress which includes, in part, also for defamation, breach of the implied covenant of good faith and fair dealings, promissory estoppel and unjust enrichment. Because of the persistent systemic, and outrageous conduct of the Defendant against the interests and well-being of the Plaintiff, the Plaintiff also request the award of punitive damages in an amount to be determined by the jury.

### II.    JURISDICTION AND VENUE

1.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332

diversity of citizenship, and the amount in controversy is more than $75,000.00 exclusive of interest and costs.

2.     Additionally, this Court has subject-matter jurisdiction under 118 U.S.C. § 1341 and under 22 U.S.C. § 2251.

3.     This Court also has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367.

4.     Plaintiff, Timothy J. McIlwain (hereinafter "Tim"), is a citizen and resident in Atlantic County, New Jersey.

5.     Defendant, Brooke Leah Berry (hereinafter referred to as "Berry") is currently domiciled in the City of Louisville, Jefferson County, in the State of Kentucky.

6.     Under 28 U.S.C. § 1391, venue is proper in this judicial district because a substantial part of the events or omissions giving rise to McIlwain's claim occurred in Jefferson County, Kentucky.  In addition, because a substantial part of events or omissions giving rise to McIlwain's claim occurred in Jefferson County, and because the defendant resides in Jefferson County, this action may be assigned to the Louisville docket of the Western Division in accordance with Joint Local Rule 3.2.

III.     **FACTS:**

Tim asserts the following facts as being both dispositive and supportaive of his demands for recovery.

1.     The parties started dating in 2009 in New York City where Tim was a practicing attorney and Berry was an aspiring actress and film maker; during this time, the relationship was off and on primarily due to Tim's concern stemming from

Berry's unresolved trauma as a victim of childhood sexual abuse from a family member.

2.  By 2016, the parties were feeling secure enough in the solidity of their relationship that Brooke became pregnant with a baby girl, HDM, who was born on July 28, 2016.

3.  After the child birth, Berry suffered severe postpartum depression causing Tim to assume the majority of the child care with the assistance of a nanny.

4.  The parties raised their daughter without incident 2 ½ years. During this time Berry started displaying concerning behavior surrounding her paranoid fantasies that Tim would leave her or cheat on her. While her behavior had infrequently manifested itself, the condition accelerated after the birth of their daughter. In response to her fears, in an attempt to alleviate them, Tim gave Berry unrestricted access to his text messages, emails and locations.

5.  Berry's postpartum depression escalated to a condition where she did not want to breast feed, or feed the baby alone. So they transitioned to bottles. Berry insisted Tim be present with the baby on all feeding occasions.

6.  After HDM's birth, before the summer of 2017, Berry proposed marriage and announced a wedding in a very public manner on a website called Zola.com with hashtag, #BerryMeMac.

7.  Due to Tim's increasing concern regarding Berry's mental condition, Tim demurred to taking such a drastic step at that time.

8.  When the marriage did not occur, Defendant Berry's mental state and

behavior became exacerbated and rapidly declined into a persistent depression.

9.      Defendant Berry's unfortunate mental decline led her to devise a nefarious plot to remove Plaintiff from their Daughter's life in the following manner:

A.  Berry convinced Plaintiff to leave New York where he just became a licensed attorney, and New Jersey, where he has been licensed to practice law for over 25 years and generates the bulk of his income to the Commonwealth of Kentucky;

B.  Berry represented to Plaintiff that the move to Louisville, Kentucky was necessary to begin a real estate venture.

C.  Berry intentionally delayed commencing a lucrative employment opportunity with a Bank in New York for many months so as to financially cripple Tim, who had all but stopped working to care for HDM;

D.  Berry induced Tim to agree to purchase a house together as an investment; her plan was to live in while renovating it to create three separate residences that would generate rental income.

E.  On April 5, 2018 Tim paid $3,000 down payment for the purchase of the house located at 1616 Bonnycastle Terrace in Louisville, Kentucky across the street from the famous Cherokee Park.

F.  On May 14, 2018 Tim paid $20,979.38 towards the equity and closing cost for the purchase of the house.

G.  In addition to Tim paying for the purchase of the house, he paid for costly renovations that were necessary because the property was an old carriage

4

house built in 1900.  In order to make the house into 3 separate apartments, appropriate for rental as an Airbnb, substantial renovations had to occur, including replacing floors, sheet rock, remediating mold in the ceiling, as well as mold and lead paint issues.

H.  While renovations were taking place, Berry placed their 2 year old daughter (HDM) in a day care in order to establish residency for the purposes of the UCCJA-KRS 403.822(1)(a);

I.  After the six (6) months residency period was established for Berry to confer family court jurisdiction on Kentucky, Berry concocted an argument with Tim, which resulted in Berry telling Plaintiff to leave the premises. Berry then embarked upon a persistent campaign of provable lies about Tim with a constant flood of filings in Family Court to block their daughter from having access with her father.

J.  In the beginning of February 2019, Berry decided she was going to have sole custody of HDM; she started limiting visitation and isolating the child from Tim.

K.  Since February 10, 2019, to the present, Berry embarked on a campaign to block Tim from his daughter, defame him, and injure him in his professional and personal life.

L.  As set forth in Exhibit A, attached hereto and incorporated by reference, in a February 10, 2019 text message, Berry refused to permit Tim to parent the child the three days a week while Berry was out-of-state; this was after

Tim was blocked from his daughter from February 10, 2019 to February 24, 2019. During that period, their daughter was living at her maternal grandmother's house several hundred miles away from both parents four to five days a week.

M. On February 23, 2019, on an agreed upon visitation, before Berry permitted Tim to see their daughter, Berry demanded payment.

N. Upon discovering that the Louisville house was under construction and an unsafe environment, and upon seeing HD's hysterical crying when he attempted to drop her off at Grandma's house at night for Brooke's work week of February 24 to February 27, 2019, Tim advised Berry that the child should be staying at the New Jersey house with the father rather than the Grandmother, who resided 800 miles away from both parents.

O. On February 27, 2019, Berry made a false report both to the Louisville, Kentucky Police Department and Margate New Jersey Police Department stating that she lived in New York. Furthermore, she deceived police by not giving them her correct address in Louisville, but instead, Berry gave the address of her mother's house to mislead the police and later the Court. Attached and made a part hereof is a February 28, 2019 Police Report as Exhibit B.

P. In order to usurp well settled law that Tim should be the primary caregiver receiving child support, Berry began creating a fictional narrative that defamed Tim as an absentee parent who was dangerous despite all

evidence to the contrary.

Q. Berry reported to schools, doctors, government agencies, bar associations, Courts, Police, Sheriffs and accusing Tim of everything from drug use to family violence, to molestation of his daughter and a relative.

R. During that period Berry influenced her daughter to stop calling Tim "Daddy," anymore.

S. Prior to the dissolution of the relationship, Berry advertised on social media to her friends and family that Tim was an attentive and involved father.

T. Prior to the proceeding in the Family Court system there had been no history of drugs or alcohol abuse and no calls to the police or any other government entities regarding abuse or neglect;

U. There were 2 undisputed facts in the custody dispute that should have established Tim as the primary caregiver to their daughter and entitled Tim to receive child support:

    i. Berry worked and lived in New York 4 days a week; and

    ii. Berry had higher income than Tim.

V. To intentionally and severely harm Tim, Defendant Berry has convinced her 3 year old, now 6 year old, daughter that Tim's name is not daddy anymore.

W. Prior to entering the Family Court system there had been no acts of domestic violence.

10. In the spring of 2019, Berry hired the Dodd & Dodd law firm, who are notorious for falsely accusing parents of molestation during custody disputes to gain an advantage in family court, and changed the strategy from May 2019 to September 2019 when Berry began filing motions on a monthly basis for sole custody without a custodial evaluation.

11. In May of 2019, Berry filed for an EPO claiming child neglect and domestic violence. This was done to distract the Court from hearing a pending motion that Tim had filed regarding the condition of the Louisville home and to impeach Berry's testimony as to her residence by establishing that Berry worked and lived in New York City 4 days a week.

12. The Court Granted the DVO but denied Berry's motion pertaining to neglect of HDM.

13. Berry enrolled the child's pediatrician, Dr. Ragland, to corroborate her story by telling her that Tim thought the Doctor committed medical malpractice because Dr. Ragland took a poor history when treating the child for a respiratory condition; meanwhile, Tim never stated that Dr. Ragland committed malpractice.

14. Berry engaged in the ongoing pattern of denying Tim access to his child on every holiday and birthday; by way of example but not limitation, to block Tim from visitation with his daughter on her birthday. On July 22, 2019, Berry along with her counsel filed a motion, but she did not copy Tim's lawyer, in order to change the existing visitation order. Upon information and belief, Berry's counsel appeared ex parte in the Court and misled the Court Clerk to enter an Order

Vacating the prior Visitation Order so Tim would not be able to celebrate his daughter's birthday with her as Tim promised to his child (i.e., promise broken). Attached and made a part hereof is a copy of the July 22, 2019, Court Order blocking Tim from having his daughter on her birthday as Exhibit C.

15. In September 2019, to prevent Tim from access to his daughter, Berry through her counsel argued that the issue of Tim's visitation with his daughter was decided and that C.H.F.S. was still investigating; so, Tim's daughter should not have access to her father.

16.     In November 2019, C.H.F.S. concluded its investigation and found no risk; zero severity and unsustained the charges with no reason for follow-up contact with C.H.F.S.; in so doing C.H.F.S essentially found as follows:

A. that the affidavit to support the restraining order on behalf of the child had been shown via investigation by C.H.F.S. that **none of the allegations** contained in the filing are true or worthy of ANY ACTION by the Cabinet. In fact, it is understood by Tim's family court counsel that the "investigation" conducted by the Cabinet pursuant to such affidavit has resulted in a finding of "no risk" to the child and is unsubstantiated.

B. C.H.F.S. placed no weight on the affidavit of the child's peditrician because it is outside the scope of the Doctor's expertise, upon information and belief.

17.     Between September and November 2019 (after C.H.F.S. discredited the pediatrician's affidavit and credentials), Berry hand picked a New York psychologist,

who was friends with Berry's psychologist, to improperly interview the 3 year old child with high pressure tactics to provide a report that Tim improperly touched the child. Neither of theses psychologists contacted Tim, sought his opinion or verified any of the allegations, despite a Court Order that granted Tim joint custody since March 2019, in violation of the Code of Professional applicable to psychologists.

18. Approximately a month after Berry's motion claiming child neglect was denied, and after Tim obtained a permanent residence in Prospect, Kentucky at the child friendly neighborhood of Norton Commons, Berry accused Tim of molesting their daughter for the first time in July 2019.

19. The first accusation of molestation involved Berry, who attended and studied drama and filmmaking at Northwestern, creating videos and authoring affidavits that were identical to scenes from the famous movie on child molestation called "Indictment: The McMartin Trial."

20. Berry made pornographic videos with the 2 year-old child, which exploited a minor to gain an advantage in the custody dispute in violation of *18 U.S.C 2251*.

21. Since the August 2019 complaint filed by Berry with Child Protective Services (CPS) claiming Tim molested their daughter and despite CPS finding no merit to the molestation charges, Tim remained blocked from his daughter for over 6 months without a hearing.

22. From February 27, 2019 until present, Berry attempted to have Tim arrested by making false statements to the police and other government agencies.

23. After the May 15, 2019 DVO was entered, Berry, working in concert with her

legal counsel, made various attempts to create incidents to make it appear as if Tim violated the DVO during pick-ups and drop-offs of his daughter.

24. By way of example but not limitation, on June 5, 2019, Tim was to drop the child at school at 2:45 PM. Berry's attorney agreed with Tim's counsel that her client would pick up the child from school at 4 PM. Attached and made a part hereof is a June 5, 2019 text message from Defendant confirming that her client was to pick up their child from school at 4 PM as Exhibit D.

25. Berry, in coordination with her lawyer, intentionally breached the agreement by showing up over an hour early at 2:45 PM, making a scene at the school with screaming that her and Attorney Elizabeth Dodd were going to have Tim taken to jail. Attached and made a part hereof is a June 5, 2019 text message confirming that Berry's lawyer breached the agreement by sending her to the school early as Exhibit E.

26. On August 6, 2019, a deposition took place at Tim's lawyer's office, Doug Haynes, Esq.

27. Due to an order obtained earlier that day, by Berry's attorney, Tim was barred from attending the deposition.

28. Tim's lawyer stopped the deposition of Berry at around 3 PM because he had a doctor's appointment with his ailing wife. Tim was told to wait in the office until Berry left.

29. Tim's attorney, Doug Haynes, advised Tim to go to the Jefferson County Courthouse and obtain the transcripts of a number of Court's rulings, including

the ruling on the day of the deposition, that deprived Tim of his ability to effectively assist his counsel, among other due process violations.

30. Following his lawyer's instruction, Tim proceeded to the courthouse arriving around 4:20 PM to obtain the necessary transcripts. The courthouse was set to close at 4:30 PM, so Tim waited as long as possible to get the transcript to avoid any possible contact with Berry or her attorney.

31. To attempt to set up Tim for a DVO violation for the second time in 2 months, Berry and her lawyer went to the courthouse immediately after the deposition ended (around 3 PM) and waited on the second floor next to the transcript office in the jury pooling room (a location lawyers are generally not permitted to be), knowing Plaintiff would go to the courthouse to get the transcript.

32. When Tim arrived at the transcript office, Berry and her lawyer ran to get the Sheriff and made multiple false statements to the Sheriff such as:

    A. Tim has violated his DVO many times and is doing it again.

    B. Berry and her lawyer "know" Tim followed them there because they saw him, etc.

33. Tim was involuntarily restrained by the Louisville Sheriff and placed in handcuffs, then taken to jail to spend the night in a cell with 36 inmates and made to sleep on a metal bunk bed with no padding.

34. On the basis of this contrived incident, Tim was incarcerated and a complaint to Kentucky Child Protective Services was filed in August 2019.

35. On May 6, 2021, Assistant Jefferson County Attorney, Hon. Kurt Kruthoffer,

Esq., dismissed the charges with prejudice and requested that Tim agree not to sue Jefferson County and stipulated that but for the false statements made by Berry and her attorney, the County would have had probable cause.

36. After reviewing the video at the courthouse it was obvious that Berry and her lawyer were loitering in the jury pool room near the office where Tim intended to go.

37. The prosecutor could plainly see that Berry and her attorney fabricated a phony violation of the DVO.

38. In an attempt to re-establish a relationship with his daughter, which included supervised visitation, Tim was coerced into accepting a settlement with draconian terms.

39. After Friend of the Court and retired Family Court Judge Joan Byer and Tim's counsel agreed that the supervised visits had some of the best reports Judge Byer had ever reviewed in her career, Tim filed a motion for unsupervised visitation.

40. Tim's motion for unsupervised visitation was granted after a hearing.

41. From November 7, 2020 to January 17, 2021 Tim had unsupervised visits with his daughter for 4 hours on Saturdays and 4 hours on Sundays every other weekend.

42. During the entire period that Tim and HDM enjoyed unsupervised visitation, Berry constantly filed false motions, which included accusations of dining at restaurants without a mask, including a restaurant Tim had never been to, and which was not even open at the alleged time. She also created videos of her

daughter in the nude for the purpose of accusing Tim of molesting HDM.

43.    Since CPS found no risk and did not sustain the charges in November 2019, Berry continued to meet with CPS workers and made the following statements that Berry knows to be false and stated soley for the purpose of placing Tim in an unfavorable light:

    A.  Tim was disbarred as an attorney;

    B.  Tim molested his niece;

    C.  There is a history of intergenerational family violence;

    D.  Tim used threats to manage conflict;

    E.  Tim is incapacitated from drugs, alcohol and unable to verbalize high risk triggers, among others.

44. Berry swore to CPS that Tim had a diagnosed mental illness that he was a Sociopath and Narcissistic, with serious personalities disorders frequently associated with serial killers.  These allegations were false, and known by Berry to be false, or were made recklessly without regard to their falsity.

45. Even though Tim was blocked from his daughter since January 21, 2021, Berry continued to bring false charges that C.H.F.S. found not to meet CPS Acceptance Criteria on the following dates:

    A.  March 11, 2021;

    B.  July 28, 2021;

    C.  July 13, 2022; and

    D.  January 19, 2023

46. Berry falsely stated under oath in Court testimony and in Court filings that there was a protective plan in place against Tim and ongoing since September 2022; meanwhile, C.H.F.S. confirmed that there is no case plan. Attached and made a part hereof is a copy of the C.H.F.S. March 7, 2023 email as Exhibit F.

## IV.    FIRST CAUSE OF ACTION:  DEFAMATION:

For <u>First Cause of Action,</u> Tim asserts that his reputation and the condition of his mental and emotional health has been defamed by Berry; as grounds for this first cause of action Tim asserts:

(A)    Tim reasserts said fully stated herein, allegations set for in paragraphs one (1) through forty-six (46), which should be incorporated by reference.

(B) With respect to those allegations, Tim asserts that at the time those statements were made by Berry, that Berry:

   A. Knew that each of those representations were false;

   B. That Berry knew that the publication of those false facts would be damaging to the reputation and health of Tim; and

   C. That Berry purposely made those false statements in order to injure the reputation of Tim, and as part of an ongoing plan to use the legal process to abuse Tim and, specifically, to use these allegations made to the New Jersey and New York Bar and Police departments as a foundation for her subsequent motions for "sole custody" while evading her own culpability for the injury done to Tim and the injury to her daughter.

## V.    SECOND CAUSE OF ACTION:  THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:

For <u>Second Cause of Action,</u> Tim asserts that Berry intentionally inflicts and has inflicted severe emotional distress upon Tim; as grounds for this <u>Second Cause of Action,</u> Tim asserts:

(A)    Tim reasserts said fully stated herein, allegations set for in paragraphs one (1) through forty-six (46), which should be incorporated by reference.

(B) As set forth above, the conduct of Berry has emotionally abused Tim as demonstrated by criminal acts of Berry's perjury and ongoing false statements to police, government entities and the Court, which on 1 occasion led to physical restraint by a false arrest leading to incarceration, all which were both "intentional" and "reckless";

(C) The conduct (actually a "continuous" course of conduct) as described by Tim pertaining to Berry is outrageous and intolerable, both in the depth and scope of the abuse, whether physical, as being restrained by law enforcement or emotional, noting that several acts of conduct were a violation of criminal law. Tim asserts that said conduct offends the generally accepted standards of decency and morality;

(D)    That mental and emotional damage as suffered by Tim as set forth above were all are a direct result of the systemic and persistent mental, physical, and "legal abuse" visited upon Tim by Berry, the damage is severe as it now includes, but not limited to, the development of post-traumatic stress syndrome[1] which necessitates ongoing medical and mental health treatment;

(E) As set forth avove, Tim asserts that the emotional and mental damages suffered as a direct result of Berry's conduct of constant accusations of molestation and attempts to incarcerate Tim are severe.

## VI.    <u>THIRD CAUSE OF ACTION: PUNITIVE DAMAGES:</u>

---

[1] PTSD, and Legal Abuse Syndrome (LAS)

16

Tim asserts a demand for punitive damages against Berry pursuant to KRS 411.184 and KRS 411.186, to wit:

(A)     As set forth in sections I., II., and III., Tim asserts that the conduct described therin is both "oppressive" in as much as Berry's conduct was specifically intended to subject Tim to cruel and unjust hardship;

(B) That Berry acted towards Tim, all as described above, with "malice"[2] in as much as Berry intended to cause both tangible and intangible injury to Tim, and in so doing, did so with flagrant indifference to the rights of Tim and with a subjective awareness that such conduct would result in bodily harm;

Tim seeks punitive damages in an amount to be determined by the jury, but to exceed Five Hundred Thousand Dollars ($500,000.00).

## VII.    FOURTH CAUSE OF ACTION:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS

For Fourth Cause of Action, Tim asserts that Berry interfered with prospective economic Advantage upon Tim; as grounds for this Fourth Cause of Action, Tim asserts:

(A)     As previously alleged in Paragraph 9 (A-I), on or about April of 2018 Tim and Berry agreed to purchase as an investment a property located at 1616 Bonnycastle Terrace, Louisville, Kentucky since it could be rented as three (3) apartments for the purpose of AirBnb rentals.

(C)     From May of 2018 until February 9, 2019, Tim paid the initial deposit when the offer purchase was made and he wired money for the closing of the property located at 1616 Bonnycastle Terrace, Louisville, Kentucky.

---

[2] As defined in KRS 411.184(1)(c).

(D)    Berry and her mother, Leah Berry, were on the deed and mortgage documents whereras Tim was not included because Berry and her mother had a better credit rating that could secure a mortgage, among other issues.

(E)  Tim continued to pay money to make repairs such as drywall replacement, painting, roof leaks, new flooring, among other expenditures to make the property ready for rental income.

(F) From approximately, September of 2018 to December of 2018, Berry was offered a job with the bank Kemper & Co. USA, but she delayed her start date.

(G)    HDM developed health problems in her chest that persisted from October 10, 2018 to February 8, 2019.

(H)    On February 7, 2019 after putting HDM to bed, Tim drove to New Jersey to participate in Oral Argument on a motion for summary judgment that was scheduled for February 8, 2019 at 10:00 AM.

(I) Berry insisted that Tim return the next day (February 9, 2019) on a 6:00 am flight out of Philadelphia.  However, Tim, who is a New Jersey Lawyer, realized that he had too much work to complete and too many files to transport.  Therefore, the flight back to Louisville, Kentucky had to be postponed.

(J) When Berry was advised that Tim would not be flying back on February 9, 2019, Berry instructed Tim not to return to Louisville, Kentucky and to have all his personal contents out of the property by March 1, 2019.

(K)   Upon advice of counsel, Tim did not abandon the investment property at 1616 Bonnycastle Terrace, Louisville, Kentucky and continued to remain as a tenant with personal items at the property.

(L) After Tim's outlay of costs were reimbursed, both Tim and Berry were to split the rental proceeds from Airbnb and direct payments from renters.

(M)   From July 28, 2016 to present, Berry has collected all payments (i.e. monies) from Airbnb and from renters directly.

(N)   Berry has not shared any of the payments (i.e. monies) received from Airbnb and from renters directly.

(O)   Since February 9, 2019, Berry has blocked Tim from seeing his daughter except for minutes on the phone.

(P) On February 24, 2019, Tim witnessed the worsening conditions of the 1616 Bonnycastle Terrace, Louisville, Kentucky wherein his daughter was exposed to unsafe conditions.

(Q)   Berry intentionally interfered with access to the1616 Bonnycastle Terrace, Louisville, Kentucky property and the release of funds obtained from Airbnb and other rental tenants.

(R) Berry has wrongfully and unlawfully violated the joint venture agreement to develop the investment property and obtain revenue from it, to Tim's immediate economic detriment.

(S) Berry's violation of the joint venture agreement is wrongful, intentional, and malicious, and diminishes Tim's reasonable expectations of economic advantage with its rental income and/or AirBnB revenue.

(T) Berry's receipt of the proceeds of the rental property constitutes a constructive trust of the funds.

(U)  As a direct and proximate result of the violation of the joint venture agreement, Tim has been and continues to be damaged and irreparably injured in its business property.

(V)  As a proximate result of the breach of the joint venture agreement by Berry, Tim has been damaged in an amount to be determined at trial, including but not limited to the cost of attorney's fees.

(W)  Berry's interference was without justification or excuse.

(X)  Berry's interference caused Tim's loss of his share of the revenues from the investment property;  there was a reasonable probability that Tim would have obtained the anticipated economic benefit had Berry not interfered.

(Y)  As a proximate result of the interference with prospective economic advantage initiated by Berry, Tim has been damaged in an amount to be determined at trial, including but not limited to the cost of attorney's fees.

## VIII.  <u>FIFTH CAUSE OF ACTION:  PROMISSORY ESTOPPEL:</u>

For <u>Fifth Cause of Action,</u> Tim asserts that Berry interfered with prospective economic

Advantage upon Tim; as grounds for this <u>Fifth Cause of Action</u>, Tim asserts:

     (A)     Tim reasserts said fully stated herein, allegations set for in paragraphs one (1) through forty-six (46), which should be incorporated by reference.

     (B)     Berry offered to reimburse Tim and offered tenancy rights in connection with the 1616 Bonnycastle Terrace, Lousiville, Kentucky project with the knowledge that Tim would reasonably rely on her promises to reimburse Tim for funds advanced and provide housing, and that if Berry reneged on that offer to reimburse and share in the profits or revenue streams, Tim would suffer substantial damages.

     (C)     In reliance on Berry's promises of revenue and housing, Tim reduced his law practice with current, former and future clients where he was earning revenues. This was largely due to his reliance on Berry's promise to reimburse him and provide housing as well as Tim's goal to be there as much as possible for HDM.

     (D)     As a result of Berry's reneging on her offer to reimburse and provide housing, Tim has suffered and continues to suffer a very significant loss of income or revenues and has further suffered irreparable damage to his career and future earnings as well as damages associated with his travel back and forth from New Jersey to Kentucky.

## IX.    <u>SIXTH CAUSE OF ACTION:  UNJUST ENRICHMENT:</u>

For <u>Sixth Cause of Action,</u> Tim asserts that Berry was unjustly enriched by Tim; as grounds for this <u>Sixth Cause of Action</u>, Tim asserts:

     (A)     Tim reasserts said fully stated herein, allegations set for in paragraphs one (1) through forty-six (46), which should be incorporated by reference.

(B)     Berry has been paid money from Tim to purchase the rental property investment and make repairs. She also received revenues from renters and Airbnb in consideration for her promises as per their agreement to share the revenues or use the revenues for the benefit of minor child. To allow Berry to continue to violate her obligations while retaining the benefit of her bargain would result in her continuing to be unjustly enriched.

(C) As a direct and proximate result of Berry's unjust enrichment, Tim has been and continues to be damaged and irreparably injured in its business and property.

## X.     **DEMAND FOR RELIEF**:

Based on the above stated Causes of Actions, Tim respectfully demands:

(A)     Recovery of compensatory damages which will fairly compensate him for the injuries and suffering inflicted upon him by Berry all according to proof.

(B)     That Tim recovered from Berry punitive damages in an amount ito be determined by the jury as more particularly set forth in KRS 413.184 and KRS 411.180, and

(C)     A Trial by jury of all issues so triable; and

(D)     That Tim receives any and all relief to which he may hereinafter appear entitled, to include equitable relief, and the right to amend his Complaint as subsequent evidence and circumstances may justify.

1

2

## **DEMAND FOR TRIAL BY JURY**

3

Under Rule 39(b) of the Federal Rules of Civil Procedure, Plaintiff McIlwain

4

demands a trial by jury on all factual issues raised in this action.

5

6

7

Respectfully submitted,

8

By___s/_Timothy McIlwain_____

9

Timothy J. McIlwain, Pro Se
215 12th Street

10

Hammonton, NJ 08037
Tel:  (609) 808-2883

11

Email:  AttorneyMcIlwain@Me.com

12

13

Dated March 15, 2023

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28